1
2
3
4
5
6
7
8             UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DEANDRE CERRONE SCOTT,                    No.  2:10-CV-02492 WBS AC

12             Petitioner,

13        v.                                   FINDINGS AND RECOMMENDATIONS

14   MIKE McDONALD,

15             Respondent.

16

17        Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254.  The action proceeds on the second amended petition, ECF

19   No. 38, which presents nine claims challenging petitioner's 2008 conviction for murder and

20   armed robbery.  Respondent has answered, ECF No. 42, and petitioner has filed a traverse, ECF

21   No. 46.

22                              BACKGROUND

23        Petitioner was charged in Sacramento County Superior Court with first degree robbery

24   and felony-murder.  The charges arose from the 2004 shooting death of Larry Elliot in the course

25   of a drug-related robbery in Rancho Cordova.  The assailants were after Elliot's marijuana and

26   the proceeds of his sales operation.  Four men were charged: petitioner, Cammit Russell

27   Doughton, Edward J. Quintanilla, and Danny Lashawn Hampton.  Hampton was tried separately.

28   A joint trial, with one jury for Quintanilla (the "orange jury") and a separate jury for petitioner

                                        1

1    and Doughton (the "blue jury"), began on February 1, 2008.

2            Trial

3            The prosecution presented the following evidence.  On the night of December 9, 2004,

4    Larry Elliot was making music in his garage with James Willis and George Porter.  According to

5    Willis, Danny Hampton called and spoke to both Elliot and Willis about coming over to buy

6    marijuana.  Hampton arrived accompanied by "CJ" Doughton.  The men smoked marijuana

7    together.  About seven minutes after Hampton and Doughton arrived, two masked men rushed

8    into the garage, one brandishing a revolver.  Willis dropped to the ground.  The masked men

9    demanded money and drugs.  One of the attackers beat Elliot in an attempt to obtain the location

10   of the drugs and money.  Elliot cried out, "Stop, ya'll are killing me."  Hampton kicked Willis as

11   he lay on the ground, and said "Don't worry, everything is gonna be all right."

12           Heidi MacKelvie, Elliot's girlfriend, was asleep on the living room couch inside the

13   house.  She woke with a gun to her head and a man whose face was obscured demanding money.

14   She gave him the cash in her wallet.  Another man came into the house and searched the

15   bedrooms.  MacKelvie and Elliot had a one year old son who was sleeping in one of the

16   bedrooms.  MacKelvie pleaded for her son to be left alone, and one of the assailants said they

17   would not bother the baby.  MacKelvie heard someone in the adjacent garage say, "If somebody

18   doesn't tell me where the fuck the money is, somebody is gonna get popped."  MacKelvie

19   escaped to a neighbor's house and called the police.  Meanwhile in the garage, Willis heard one

20   of the assailants tell Elliot that he was going to get shot if he said another word.  Willis heard

21   Doughton say, "I told you not to look up," followed by a gunshot.  Doughton told Willis not to

22   say anything, and ran from the garage toward the park.  Elliot died of a gunshot wound to the

23   head.

24           Kobra Turner testified that earlier that evening she had driven her boyfriend, Eddie

25   Quintanilla, to meet Doughton, Hampton and petitioner at a motel.  Turner knew petitioner, who

26   was Quintanilla's best friend.  At Quintanilla's request, Turner then drove petitioner from the

27   motel to his house and back to the motel.  Later the four men drove in two cars, one driven by

28   Turner at Quintanilla's direction and one by petitioner, to a neighborhood in Rancho Cordova.

2

1    Both cars parked near a neighborhood park.  Doughton and Hampton got out and walked away,

2    while petitioner and Quintanilla remained behind in the vehicles.  In a previous interview, Turner

3    had told police that the two men told Quintanilla and petitioner that they would call when they

4    confirmed "the guy was at the house."  Turner thought they were going to buy weed.  A few

5    minutes later Quintanilla got a call, and he and petitioner got out of the cars and walked away in

6    the same direction as Doughton and Hampton.  Turner waited in her car.  Twenty minutes later,

7    Quintanilla and petitioner came running to the cars, followed by Doughton and Hampton.

8    Quintanilla was saying "Go, go, go."  Turner drove away, following petitioner.  In the car,

9    Quintanilla asked, "Who capped him?"  Turner followed petitioner's car to Quintanilla's house,

10   where the four men went inside.  When Turner entered the house, the four men were together in

11   the den and she was told to go into another room.  During this course of events Turner did not

12   hear the men discuss a robbery, and did not see guns or masks.  A couple of days after these

13   events Quintanilla went to Oregon, where he was subsequently arrested.

14       Keisha Tucker told police on Christmas Eve that petitioner and Eddie Quintanilla had

15   shown up at her apartment on the morning of December 10, 2004, with packaged marijuana.

16   They were acting strange and being secretive.  They talked about getting out of town.

17       Brandi Cummings testified that Doughton and Hampton showed up at her apartment on

18   December 10.  Hampton had a small backpack inscribed with the name of Quintanilla's brother.

19   Hampton stayed the night, and Doughton stayed for several days.  They left the backpack behind.

20   It contained marijuana packaged for sale.

21       Petitioner was arrested in Phoenix, Arizona, on February 3, 2006.

22       Petitioner presented an alibi defense.  Destiny Scott (no relation) testified that she was

23   involved in a minor traffic collision with petitioner on the night of December 9, 2004 in Fairfield.

24   Defendant's car hit her from behind, causing no damage.  She did not report the accident because

25   she was driving without a license.  After both drivers pulled over, she took pictures of petitioner's

26   car and license plate with her cell phone.  The undated photos, which she had emailed to herself

27   from her phone near the time of the accident and subsequently printed for trial, were admitted into

28   evidence.  Ms. Scott wrote petitioner's information on a receipt.  She later copied the information

1    on a piece of paper that was admitted into evidence, and threw away the receipt.

2           After eleven days of evidence and seven days of deliberations, the jury found petitioner

3    guilty of the robbery and murder of Elliot.  The jury could not reach a verdict as to petitioner

4    regarding the robbery of Heidi MacKelvie.  The jury also could not reach a verdict on gun-related

5    findings and special circumstances alleged against petitioner.  A mistrial was declared as to the

6    deadlocked matters, and the prosecution subsequently dismissed those charges.  The court

7    determined in a bifurcated proceeding that petitioner had suffered two prior felony convictions.

8    Petitioner was sentenced to 75 years to life in prison, plus ten years.

9           <u>Post-conviction Proceedings</u>

10          The California Court of Appeal affirmed the judgment on March 8, 2010.  The California

11   Supreme Court denied review on June 9, 2010.

12          Petitioner's first application for collateral review was filed in this court.  The initial

13   federal petition was dated August 27, 2010 and was docketed on September 15, 2010.  It

14   presented two claims that had been exhausted on direct appeal.

15          The following month, petitioner submitted a habeas petition containing previously

16   unexhausted claims to the Sacramento County Superior Court.  That petition was denied on the

17   merits in a written order on December 15, 2010.

18          On January 19, 2011, petitioner moved in this court to stay proceedings pending

19   exhaustion of state court remedies on his additional claims.  That motion was denied six months

20   later.  <u>See</u> ECF No. 14 (Findings and Recommendations), ECF No. 17 (order adopting Findings

21   and Recommendations).

22          In the meantime petitioner had continued to pursue relief in the state courts.  The claims

23   rejected by the superior court were filed next in the California Court of Appeal for the Third

24   District, which summarily denied relief on May 20, 2011.  Petitioner next submitted his petition

25   to the California Supreme Court, which issued a summary "postcard denial" on December 21,

26   2011.

27          On March 21, 2012, petitioner submitted a proposed amended petition to this court,

28   seeking to add his newly exhausted claims.  Pursuant to court order granting his motion to amend,

4

1   ECF No. 34 (order dated January 15, 2013), petitioner consolidated his original and newly-

2   exhausted claims in a second amended petition that was filed on March 20, 2013.  ECF No. 38.

3   Respondent answered on the merits, without asserting any procedural defenses, on May 17, 2013.

4   ECF No. 42.  Petitioner filed a traverse in August 19, 2013.  ECF No. 46.

5                   STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

6           28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of

7   1996 ("AEDPA"), provides in relevant part as follows:

8               (d) An application for a writ of habeas corpus on behalf of a person
                in custody pursuant to the judgment of a state court shall not be
9               granted with respect to any claim that was adjudicated on the merits
                in State court proceedings unless the adjudication of the claim –
10
                (1) resulted in a decision that was contrary to, or involved an
11              unreasonable application of, clearly established Federal law, as
                determined by the Supreme Court of the United States; or
12
                (2) resulted in a decision that was based on an unreasonable
13              determination of the facts in light of the evidence presented in the
                State court proceeding.
14

15          The statute applies whenever the state court has denied a federal claim on its merits,

16  whether or not the state court explained its reasons.  Harrington v. Richter, 131 S. Ct. 770, 785

17  (2011).  State court rejection of a federal claim will be presumed to have been on the merits

18  absent any indication or state-law procedural principles to the contrary.  Id. at 784-785 (citing

19  Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is

20  unclear whether a decision appearing to rest on federal grounds was decided on another basis)).

21  "The presumption may be overcome when there is reason to think some other explanation for the

22  state court's decision is more likely."  Id. at 785.

23          The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

24  principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538

25  U.S. 63, 71-72 (2003).  Clearly established federal law also includes "the legal principles and

26  standards flowing from precedent."  Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002)

27  (quoting Taylor v. Withrow, 288 F.3d 846, 852 (6th Cir. 2002)).  Only Supreme Court precedent

28  may constitute "clearly established Federal law," but circuit law has persuasive value regarding

1  what law is "clearly established" and what constitutes "unreasonable application" of that law.

2  Duchaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000); Robinson v. Ignacio, 360 F.3d 1044,

3  1057 (9th Cir. 2004).

4      A state court decision is "contrary to" clearly established federal law if the decision

5  "contradicts the governing law set forth in [the Supreme Court's] cases." Williams v. Taylor, 529

6  U.S. 362, 405 (2000).  A state court decision "unreasonably applies" federal law "if the state

7  court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to

8  the facts of the particular state prisoner's case." Id. at 407-08.  It is not enough that the state court

9  was incorrect in the view of the federal habeas court; the state court decision must be objectively

10  unreasonable.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

11      Review under § 2254(d) is limited to the record that was before the state court.  Cullen v.

12  Pinholster, 131 S. Ct. 1388, 1398 (2011).  The question at this stage is whether the state court

13  reasonably applied clearly established federal law to the facts before it.  Id.  In other words, the

14  focus of the § 2254(d) inquiry is "on what a state court knew and did." Id. at 1399.  Where the

15  state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the

16  state court's actual reasoning" and "actual analysis." Frantz v. Hazey, 533 F.3d 724, 738 (9th

17  Cir. 2008) (en banc).  A different rule applies where the state court rejects claims summarily,

18  without a reasoned opinion.  In Richter, supra, the Supreme Court held that when a state court

19  denies a claim on the merits but without a reasoned opinion, the federal habeas court must

20  determine what arguments or theories may have supported the state court's decision, and subject

21  those arguments or theories to § 2254(d) scrutiny.  Richter, 131 S. Ct. at 786.

## DISCUSSION

23  I.     Claim One:  Sufficiency of the Evidence

24          A. Petitioner's Allegations

25      Petitioner contends that there was insufficient evidence presented at trial to sustain his

26  conviction, and that he is actually innocent.  Specifically, petitioner alleges that the prosecution

27  failed to prove beyond a reasonable doubt that he was present at Elliot's house and not in

28  Fairfield with Destiny Scott at the time of the crimes.  In this context petitioner also alleges that

1    the trial court improperly permitted the prosecutor to argue that the alibi was false, failed to

2    require trial counsel to investigate and develop additional alibi witnesses, and permitted the

3    prosecutor to argue that James Willis and Kobra Turner were not accomplices.  See Second

4    Amended Petition, ECF No. 38 at 5, 25-31.

5                    B.  The Clearly Established Federal Law

6          Due process requires that each essential element of a criminal offense be proven beyond a

7    reasonable doubt.  United States v. Winship, 397 U.S. 358, 364 (1970).  In reviewing the

8    sufficiency of evidence to support a conviction, the question is "whether, viewing the evidence in

9    the light most favorable to the prosecution, *any* rational trier of fact could have found the essential

10   elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319

11   (1974).  If the evidence supports conflicting inferences, the reviewing court must presume "that

12   the trier of fact resolved any such conflicts in favor of the prosecution," and the court must "defer

13   to that resolution."  Id. at 326.

14         Jackson constitutes "clearly established federal law" for purposes of the AEDPA.  See

15   Cavazos v. Smith, 132 S.Ct. 2 (2011).  There is no "clearly established federal law," however,

16   that recognizes a constitutional right not to be criminally convicted if innocent.  See Herrera v.

17   Collins, 506 U.S. 390, 404 (1993); Dist. Attorney's Office v. Osborne, 557 U.S. 52, 71-72 (2009)

18   (recognizing that Court has not decided the issue).[1]  Accordingly, Jackson alone governs here.

19                    C.  The State Court's Ruling

20         Because the California Supreme Court denied this claim without comment, ECF No. 38-1

21   at 70, this court "looks through" the silent denial to the last reasoned state court decision.  See

22   Ylst v. Nunnemaker, 501 U.S. 797 (1991).  Because the superior court issued the only reasoned

23   decision adjudicating the claim, that is the decision reviewed for reasonableness under § 2254(d).

24   See Bonner v. Carey, 425 F.3d 1145, 1148 n.13 (9th Cir. 2005).

25   _____

26   [1] Actual innocence may provide a gateway through procedural bar or an exception to the statute
     of limitations, see Schlup v. Delo, 513 U.S. 298 (1995) (procedural default), McQuiggin v.

27   Perkins, 133 S.Ct. 1924 (2013) (statute of limitation), but the Supreme Court has not held that it
     provides a free-standing basis for relief from a non-capital conviction.  See Herrera, 506 U.S. at

28   404.

The superior court ruled as follows:

> Petitioner first claims that the evidence was insufficient to support the conviction, that the prosecution failed to prove every element of intent, express malice and premeditation, for the first degree murder, and that appellate counsel was ineffective in failing to raise the claim on appeal.

> Petitioner fails to attach a copy of the reporter's transcript of the entire trial, so that the court may review the evidence and determine whether it is sufficient to uphold the judgment.  As such, the claim is denied.  (In re Harris (1993) 5 Cal.4th 813, 827. fn. 5).

> Regardless, even from petitioner's own description of the evidence presented at trial, petitioner ignores the testimony from Kobra Turner that petitioner was one of four persons she saw immediately before and after the murder, which constituted sufficient circumstantial evidence that petitioner was one of the assailants. Other testimony described by petitioner, put together with this testimony, established that petitioner was one of the masked men at the robbery.  Other testimony described by petitioner established all elements needed for the robbery and for robbery-murder, which as a form of felony-murder does not require the same showing as that required for malice aforethought murder.  Rather, felony-murder requires only a showing that the defendant perpetrated or was an accomplice in the commission of a felony during which a killing occurred (see generally People v. Washington (1965) 62 Cal.2d 777); it does not require intent to kill or premeditation or deliberation.

> It appears that petitioner is essentially attempting to claim that the jury should have rejected the circumstantial evidence indicating his guilt and instead believed his alibi witness that petitioner was across town in a car accident with the witness and not at the scene at all.  For a sufficiency of the evidence claim, however, the court does not reweigh the evidence but instead examines the evidence to determine whether the evidence most favorable to the prosecution, if believed, would establish the crime (see generally People v. Rodriguez (1999) 20 Cal.4th 1).  As the evidence as described by petitioner was sufficient, petitioner fails to set forth a prima facie case for relief, requiring denial of the claim in any event (In re Bower (1985) 38 Cal.3d 865).

> Petitioner also claims that the trial court should have required trial counsel to further investigate petitioner's alibi defense and call other witnesses present during the accident to substantiate the pictures taken of petitioner's car on the night in question by the alibi witness from her cell phone.  Petitioner also claims that trial counsel was ineffective in failing to fully present the defense and in not objecting to the prosecutor's argument that the alibi defense had been manufactured.

> A trial court has no duty to order defense counsel to investigate a case in a particular way, and that would be improper.  Rather, the claim is viable only in ineffective assistance of counsel terms.

Even in those terms, however, the claim fails, as petitioner fails to attach any affidavit from such other witness, attesting to what that witness would have testified to at trial that would have been reasonably likely to have made a difference in the outcome of the trial, nor does he attach any purported photographs that he claims were taken showing proof that he was in the car accident as well as foundational proof of the veracity of such photographs.  Nor would objection to the prosecutorial argument, as described by petitioner, have been to any avail, as the prosecutor was within the proper boundaries of argument in urging the jurors to disbelieve the alibi defense as having been manufactured.  As such, the claim is denied (Harris, supra; Strickland v. Washington (1984) 466 U.S. 668).

Petitioner next claims that the trial court should have restricted the prosecution from arguing to the jury that James Willis and Kobra Turner were not accomplices, and that appellate counsel was ineffective in failing to raise the claim on appeal.

It appears, however, that it had become a jury question as to whether these two were accomplices, for purposes of applying certain rules to accomplice testimony pursuant to Penal Code § 1111.  As such, the defendant was free to argue that the two were accomplices and the prosecution was free to argue that the two were not accomplices.  Petitioner fails to show otherwise, thus the claim is denied (Bower, supra).

ECF No. 38-1 at 64-66.

### D.  Objective Reasonableness Under § 2254(d)

The superior court rejected petitioner's sufficiency of the evidence claim without reviewing the trial transcripts, on the basis of the factual summary contained in the Court of Appeal's opinion on direct review and petitioner's characterization of the trial evidence.  The undersigned questions whether this was a proper basis for determining that Jackson was satisfied.  However, for the reasons now explained, the conclusion reached by the state court is entirely consistent with Jackson.  Even if AEDPA standards did not apply to this claim,[2] therefore,

---

[2] The Ninth Circuit has suggested that an unreasonable adjudicative process can deprive a state court decision of deference under AEDPA.  See Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir.), cert. denied, 543 U.S. 1038 (2004).  Ruling on the sufficiency of evidence without reviewing the trial transcript might be considered unreasonable.  On the other hand, the Supreme Court has emphasized that AEDPA review must proceed on the basis of the record that was actually before the state court.  Cullen v. Pinholster, 131 S. Ct. at 1398-99.  Petitioner's trial transcripts were no before the superior court on habeas because he did not provide them.  It is unnecessary to determine whether AEDPA deference applies here, or to consider whether petitioner defaulted his claim in state habeas by failing to comply with the rules requiring him to attach the pertinent transcripts.  Respondent has not asserted procedural default in the Answer.  In any case, petitioner's claim lacks merit under any standard of review.

1   petitioner would not be entitled to relief.

2          The testimony of James Willis supported the conclusions (1) that Doughton and Hampton

3   were acting in concert with the two masked men who burst into Elliot's garage to rob him, and (2)

4   that Doughton shot Elliot.  Although Willis did not identify either of the masked men, Kobra

5   Turner placed petitioner with Doughton and Hampton immediately before and immediately after

6   the robbery, and described them acting in a coordinated manner.  Her testimony readily supports

7   the conclusion that petitioner and Quintanilla were the two masked men.  The testimony of these

8   two witnesses is evidence from which a rational trier of fact could find that petitioner participated

9   in the underlying felony, and therefore was guilty of felony-murder.

10         Petitioner contends that "[c]ircumstantial evidence was the only evidence that resulted in

11  Petitioner receiving a sentence of 75 years to life plus ten years."  Second Amended Petition, ECF

12  No. 38, at 26.  A jury's reliance on circumstantial evidence does not violate due process.  The

13  only question is whether there was evidence from which any rational trier of fact could have

14  drawn the inferences necessary to support the conviction.  Jackson, 443 U.S. at 319, 326; see also

15  United States v. Del Toto-Barboza, 673 F.3d 1136, 1145 (9th Cir. 2012) (Jackson satisfied where

16  "there was a plausible chain of logic to support the jury's verdict").  The state court answered this

17  question in the affirmative, and that conclusion was not unreasonable.  To the extent that

18  petitioner argues the jury should have found the circumstantial evidence of his guilt not to be

19  credible, and should instead have believed his alibi, the state court correctly noted that reviewing

20  courts do not reweigh the evidence or decide witness credibility.  Because the jury's inferences

21  were not unreasonable, they cannot be disturbed on collateral review.

22         Having independently reviewed the trial transcripts in their entirety, the undersigned

23  identifies no facts or circumstances not considered by the superior court that would support a

24  different result.  The state court was correct: the evidence in this case, viewed in the light most

25  favorable to the prosecution, establishes the essential elements of robbery and felony-murder.

26         The state court also reasonably resolved the ancillary issues that petitioner presented in

27  relation to his insufficient evidence claim.  A trial court has no power or duty to direct defense

28  counsel's investigation or presentation of the case.  The trial court here had no duty to chastise the

1   prosecutor for improper argument – there was no improper argument, for the reasons discussed

2   below regarding the prosecutorial misconduct claim.  Finally, this court must defer to the state

3   court's ruling that California law regarding accomplice testimony was properly applied.  That

4   issue does not present a federal constitutional question.  The superior court's rulings on these

5   matters involved no unreasonable application of clearly established federal law.

6          For all these reasons, petitioner is not entitled to relief on Claim One.

7   II.      Claim Two:  Prosecutorial Misconduct

8              A.  Petitioner's Allegations

9          Petitioner claims that he was subjected to prosecutorial misconduct during the course of

10  pretrial proceedings and trial, and that he was subjected to police misconduct, malicious abuse of

11  process, unlawful attachment and vindictive prosecution.  Petitioner's complaint regarding

12  pretrial events centers on the allegation that police investigators and the prosecutor knew that

13  witness James Willis was untruthful and was hiding his own involvement in the Elliot robbery-

14  murder.  Regarding the trial, petitioner alleges that prosecutor Robert Gold made numerous

15  improper statements during opening and closing argument, wrongfully insinuated that petitioner

16  had fabricated his alibi, and relied on the perjured testimony of James Willis.  See ECF No. 38 at

17  33-43.  These allegations are accurately detailed in the decision of the Sacramento County

18  Superior Court, quoted below.

19              B.  The Clearly Established Federal Law

20         A prosecutor's improper statements violate the constitution only where they "so infect[]

21  the trial with unfairness as to make the resulting conviction a denial of due process."  Darden v.

22  Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristophoro, 416 U.S. 637, 643

23  (1974) (internal quotation marks omitted)).  It is not enough that the remarks were "undesirable or

24  even universally condemned."  Darden, 477 U.S. at 181.  Fundamental fairness must be assessed

25  in context of the trial as a whole, including the weight of the evidence, the defense opportunity to

26  respond, and the instructions given to the jury.  Id. at 181-82.

27         The knowing presentation of perjured testimony by the prosecution violates due process.

28  Napue v. Illinois, 360 U.S. 264, 269 (1959); Giglio v. United States, 405 U.S. 150, 153 (1972)

1  ("deliberate deception of a court and jurors by the presentation of known false evidence is

2  incompatible with [the] rudimentary demands of justice.").

3       C.  The State Court's Ruling

4       The superior court denied this claim in a reasoned decision, which was presumptively

5  adopted by the California Supreme Court's "postcard denial."  See Bonner v. Carey, 425 F.3d

6  1145, 1148 n.13 (9th Cir. 2005).  The superior court ruled as follows:

7
        Petitioner first cites the prosecution's use of Willis as a confidential
8       informant, and claims that the prosecution knew that Willis needed
        to remove himself as a suspect and replace himself with petitioner
9       as the fourth person committing the robbery, despite evidence that
        petitioner [w]as in a car accident with Destiny Scott across town at
10      the time.   Petitioner claims that the prosecution knowingly
        presented perjured testimony of Willis at trial.
11
        The prosecution, however, has charging discretion.  This involves a
12      judgment call on the prosecution's part as to which evidence is
        more believable.  Petitioner does not have unerring evidence that he
13      in fact was across town involved in a car accident so as to make it
        physically impossible for him to have been one of the robbers.  The
14      police and prosecution had discretion to choose to disbelieve
        petitioner's story and to instead believe Willis, whose version of
15      events was not physically impossible.  It was then up to the jury to
        decide which version to believe, and the jury believed the version
16      that the prosecution had believed.   That is the essence of our
        country's jury trial system.  As the prosecution committed no error,
17      the claim is denied (Bower, supra).

18      Petitioner also argues that the prosecutor engaged in the following
        misconduct:  (1)  during  opening  statements,  the  prosecutor
19      misstated the evidence and attempted to improperly influence the
        jurors from stating that others had guns during the course of the
20      robbery-murder, (2) the prosecutor argued that Quintanilla was the
        first person to leave the scene, when the evidence showed that
21      petitioner, who petitioner claims was actually Willis and not him,
        left first, (3) the prosecutor misstated the evidence by stating that
22      Turner saw all four suspects leave and run down the street together,
        (4)  the  prosecutor  misstated  the  evidence  by  arguing  that
23      Quintanilla heard a shot as Quintanilla was running away from the
        scene, (5) the prosecutor misstated the evidence by arguing that
24      Willis could not identify the two masked men, which contradicted
        Turner's testimony that she saw all four men leave together, (6)
25      during closing argument, the prosecutor stated that MacKelvie had
        identified petitioner, (7) the prosecutor tried to influence the jury by
26      referring to alibi witness Destiny Scott as a "Soddi,"  (8) the
        prosecutor stated that the first time anyone heard of petitioner's
27      alibi witness was three days before the jurors came to court to be
        jurors, (9) the prosecutor relayed two conflicting statements to the
28      jury regarding accomplices Willis and Turner, (10) the prosecutor
        made a disparaging remark about defense counsel with a reference

                                    12

to Dr. Super, the Statue of Liberty, slicing salami, and the Sphinx, (11) the prosecutor told the jury that alibi witness Destiny Scott was lying, with a reference to cherry on the pudding, (12) the prosecutor told the jury not to believe Destiny Scott because she was homeless but to believe prosecution witness James Scott because he was homeless, (13) the prosecutor told the jurors that they had to believe either Destiny Scott or Kobra Turner, (14) the prosecutor argued that all of the suspects were beating the victim, when in fact the evidence was that only one person kicked and pistol-whipped the victim, (15) the prosecutor in closing defended the use of illegal drugs and lied in doing so, (16) the prosecutor argued that the only thing that Willis did to be an accomplice was to beat on the box or keyboard when asked to turn on some music, (17) the prosecutor argued that trial counsel dreamed up the alibi defense story and that petitioner was lying about being in a car accident with Destiny Scott, and (18) the prosecutor argued that defense counsel was lying on other matters as well.

Petitioner, however, fails to attach copies of reporter's transcript showing the above and that it constituted misconduct (Harris, supra). Indeed, even if true as alleged, petitioner fails to show that the prosecutor went outside the realm of permissible argument based on the evidence presented at the trial, or that any of it, if outside the realm or otherwise constituting misconduct, was prejudicial. As such, the claim is denied (Bower, supra).

ECF No. 38-1 at 66-67.

### D.  Objective Reasonableness Under § 2254(d)

The undersigned notes at the outset that the superior court's adjudication of the prosecutorial misconduct claim proceeded without comprehensive review of the trial transcript, which means that the court cannot have evaluated the challenged actions and statements in light of the trial record as a whole. However, for the reasons explained below, the state court's conclusions were not unreasonable. Having independently reviewed the trial transcripts in their entirety, the undersigned identifies no facts or circumstances not considered by the superior court that would support a different result. Under any standard of review, see supra n.2, petitioner is not entitled to relief.

The comments to which petitioner objects were, for the most part, within the scope of permissible argument. Even if some comments were inappropriate – for example, the prosecutor's statement in closing argument that the defense had disclosed its alibi theory only three days before trial -- when they are considered in the context of the trial as a whole, no

13

1  fundamental unfairness is apparent.[3]  See Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir. 1996)

2  ("Improper argument does not, per se, violate a defendant's constitutional rights.").  The evidence

3  against petitioner was more than sufficient to sustain the conviction.  The defense had ample

4  opportunity to counter the objectionable arguments, and counsel did so vigorously.  The jury was

5  instructed that the arguments of counsel are not evidence, and was properly instructed on the

6  assessment of witness credibility, alibi, and burdens of proof.  On this record, there is no due

7  process violation.

8         As to the allegations that the prosecutor presented perjured testimony, petitioner has not

9  met his burden of establishing that (1) Willis's testimony was actually false, (2) the prosecutor

10  knew it was false, and (3) the testimony was material.  See Hayes v. Brown, 399 F.3d 972, 984

11  (9th Cir. 2005) (en banc).  Petitioner presents no evidence supporting his theory that Willis was in

12  on the robbery, or that his testimony about what happened in Elliot's garage was materially false.

13  Petitioner had a full opportunity at trial to impeach Willis, whose credibility was a question for

14  the jury.[4]  That credibility determination is not subject to relitigation here.  See Bruce v. Terhune,

15  376 F.3d 950, 957 (9th Cir. 2004) ("A jury's credibility determinations are . . . entitled to near-

16  total deference.").

17  _____

18  [3] Destiny Scott's credibility was fair game.  The prosecutor vigorously challenged her ability to
    remember the date of the accident; her convenient surfacing as a witness over three years after the

19  accident, having had no prior contact with petitioner since the accident and despite numerous
    changes in her address and phone number; her connection to petitioner's neighborhood and

20  environs; and her general reliability.  These challenges were not out of bounds.  The undersigned
    also notes that the parties stipulated to the fact that Karen Taylor, who Ms. Scott testified had

21  tracked her down and urged her to contact the defense investigator regarding the accident, was
    not an employee of defense counsel nor known to the defense investigator.  The parties also

22  stipulated to the fact that the residential address Ms. Scott had provided to the defense
    investigator and testified was her address was a condemned and vacant apartment.

23
    [4] The jury knew that Willis had a criminal history, that he sold drugs for Elliot, and that he was

24  under the influence of marijuana at the time of the robbery and homicide.  After initially denying
    knowledge of who had shot Elliot, Willis cooperated with investigation of the case.  He agreed to

25  wear a wire to a meeting with Hampton, to record a discussion about what had happened in
    Elliot's garage.  He was not prosecuted for his involvement in Elliot's marijuana business, and

26  did not face probation violation for the illegal activities he revealed in the course of the
    investigation.  He was relocated through the witness protection program, and had his probation

27  terminated early so that he could leave the state.  All these matters were elicited on direct
    examination and explored on cross-examination by three defense lawyers.

28
                                        14

1    None of petitioner's allegations rise to the level of a due process violation because none

2    implicate the fundamental fairness of the trial.  Accordingly, petitioner is not entitled to relief on

3    Claim Two.

4    III.    Claim Three:  Ineffective Assistance of Trial Counsel

5        A. Petitioner's Allegations

6    Petitioner claims that his trial counsel was ineffective in failing to expose the insufficiency

7    of the prosecutor's evidence and failing to prove the alibi to the jury's satisfaction.  Petitioner

8    alleges that counsel waited until the last minute to locate alibi witness Destiny Scott; failed to

9    develop other, unspecified, alibi witnesses; failed to object to improper prosecutorial tactics,

10   comments, and argument; and failed to establish his innocence.  See ECF No. 38 at 44-58.

11       B. The Clearly Established Federal Law

12   To establish a constitutional violation based on ineffective assistance of counsel, a

13   petitioner must show (1) that counsel's representation fell below an objective standard of

14   reasonableness, and (2) that counsel's deficient performance prejudiced the defense.  Strickland v.

15   Washington, 466 U.S. 668, 692, 694 (1984).  Prejudice means that the error actually had an

16   adverse effect on the defense.  There must be a reasonable probability that, but for counsel's

17   errors, the result of the proceeding would have been different.  Id. at 693-94.  The court need not

18   address both prongs of the Strickland test if the petitioner's showing is insufficient as to one

19   prong.  Id. at 697.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of

20   sufficient prejudice, which we expect will often be so, that course should be followed."  Id.

21       C. The State Court's Ruling

22   In the only reasoned state court decision, the superior court discussed petitioner's

23   Strickland allegations in the context of his insufficient evidence claim, as follows:

24       [T]he claim [that counsel failed to investigate and develop the alibi
         defense] is viable only in ineffective assistance of counsel terms.
25       Even in those terms, however, the claim fails, as petitioner fails to
         attach any affidavit from such other witness, attesting to what that
26       witness would have testified to at trial that would have been
         reasonably likely to have made a difference in the outcome of the
27       trial, nor does he attach any purported photographs that he claims
         were taken showing proof that he was in the car accident as well as
28       foundational proof of the veracity of such photographs.  Nor would

15

1
2
3

> objection to the prosecutorial argument, as described by petitioner, have been to any avail, as the prosecutor was within the proper boundaries of argument in urging the jurors to disbelieve the alibi defense as having been manufactured.  As such, the claim is denied (Harris, supra; Strickland v. Washington (1984) 466 U.S. 668).

4   ECF No. 38-1 at 65.

5               D.  Objective Reasonableness Under § 2254(d)

6          The state court did not unreasonably apply federal law by denying the ineffective

7   assistance claim for lack of prejudice.  Without a showing of the evidence that counsel could have

8   developed and presented to achieve a different result, the claim fails as a matter of law.  See

9   Strickland, 466 U.S. at 697 (if it is easiest to dispose of an ineffectiveness claim on the ground of

10  lack of prejudice, that course should be followed).  Plaintiff made no such showing.  Accordingly,

11  he cannot prevail.  See Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir. 1997) ("Speculation about

12  what [a witness] could have said is not enough to establish prejudice."); Hendricks v. Calderon,

13  70 F.3d 1032, 1042 (1995) ("Absent an account of what beneficial evidence investigation into

14  any of these issues would have turned up, [petitioner] cannot meet the prejudice prong of the

15  Strickland test.").  Because petitioner's allegations do not establish a prima facie claim under

16  Strickland, the state court's denial of relief was both reasonable and correct.

17         It was also reasonable for the state court to reject the proposition that counsel was

18  ineffective in failing to object to the prosecutor's attack on the truth of the alibi defense.  As the

19  state court correctly noted, that argument was not impermissible.  Because objection would

20  therefore have been futile, counsel cannot have acted unreasonably in failing to object and

21  petitioner cannot have been prejudiced.

22      IV.     Claim Four:  Ineffective Assistance of Appellate Counsel

23            A.  Petitioner's Allegations

24         Petitioner alleges generally that appellate counsel was ineffective in failing to raise the

25  contentions presented in the habeas petition.  ECF No. 38 at 60-61.  Petitioner refers to Exhibit A,

26  which is correspondence from appellate counsel explaining why she was not asserting jury

27  misconduct or insufficient evidence, challenging the testimony of Kobra Turner, or attempting to

28  relitigate the alibi defense.  See ECF No. 38-1 at 1-4 (Petitioner's Ex. A).

16

B. The Clearly Established Federal Law

A criminal defendant enjoys the right to effective assistance of counsel on appeal. Evitts v. Lucey, 469 U.S. 387, 391 (1985). The Strickland framework applies to claims that this right has been violated. Smith v. Robbins, 528 U.S. 259, 285 (2000). To demonstrate prejudice, petitioner must show a reasonable probability that he would have prevailed on appeal absent counsel's errors. Id. at 285-86.

C. The State Court's Ruling

In the only reasoned state court decision, the superior court denied petitioner's substantive claims regarding jury misconduct, insufficient evidence, the testimony of James Willis and Kobra Turner, and the alibi defense, along with petitioner's corollary claims of appellate ineffectiveness. ECF No. 38-1 at 64-68. Whether § 2254(d) review of Claim Four focuses on the California Supreme Court's unreasoned denial of Claim Four as a whole or "looks through" to the relevant portions of the superior court decision, the question for this court is the same: was it objectively unreasonable of the state court(s) to summarily deny relief on grounds of ineffective assistance of appellate counsel?

D. Objective Reasonableness Under § 2254(d)

Because petitioner's free-standing constitutional claims lack merit for the reasons explained elsewhere in these Findings and Recommendations, it cannot have been unreasonable to summarily reject the claim of appellate ineffectiveness. Where petitioner has not identified a meritorious issue for appeal, he cannot state a prima facie case of ineffective assistance on appeal. Smith, 528 U.S. at 285-86. Because the state court's resolution of the claim therefore was not unreasonable, habeas relief is unavailable.

V.     Claim Five:  Failure of Proof Regarding Intent

A. Petitioner's Allegations

Petitioner's fifth claim for relief focuses on proof of intent to murder, which he (correctly) alleges was missing from the evidence at trial. Petitioner claims that his conviction cannot stand in the absence of proof that he intended to kill Larry Elliot. In this context petitioner also repeats his contentions that witnesses James Willis and Kobra Turner falsely identified him in order to

17

1    escape liability as accomplices, and that petitioner was not present when the crime took place.

2    ECF No. 38 at 63-67.

3          B.  The Clearly Established Federal Law

4          Due process requires that each essential element of the charged criminal offense be proven

5    beyond a reasonable doubt.  United States v. Winship, 397 U.S. 358, 364 (1970).  The U.S.

6    Supreme Court has never suggested that felony-murder statutes, which establish first-degree

7    murder liability upon proof of the elements of the underlying felony and without proof of intent to

8    kill, offend the Constitution. [5]

9          C.  The State Court's Ruling

10         The superior court's written decision did not address this claim, and the California

11   Supreme Court denied it summarily in habeas.  Accordingly, this court asks whether there is any

12   reasonable basis for the state court's decision.  Richter, 131 S. Ct. at 786.

13         D.  Objective Reasonableness Under § 2254(d)

14         To the extent that petitioner contends California law requires proof of intent to kill, the

15   claim does not present a federal constitutional question cognizable in habeas.  Pulley v. Harris,

16   465 U.S. 37, 41 (1984); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[W]e have repeatedly

17   held that 'it is not the province of a federal habeas court to reexamine state-court determinations

18   on state-law questions.'").

19         To the extent that petitioner challenges the constitutionality of felony-murder liability

20   itself, the claim is unsupported by any clearly established federal law.  Under California's felony-

21   murder rule, a murder committed in the perpetration of an enumerated felony, including robbery,

22   is first degree murder.  People v. Lindburg, 45 Cal. 4th 1, 27 (2008).  The requisite mental state is

23   "simply the specific intent to commit the underlying felony; neither intent to kill, deliberation,

24   premeditation, nor malice aforethought is needed."  People v. Hart, 20 Cal. 4th 546, 608 (1999).

25   ─────────────────

26   [5] The Court has limited, on Eighth Amendment grounds, state statutes that authorize the death
     penalty in felony-murder cases.  See Enmund v. Florida, 458 U.S. 782 (1982); Tison v. Arizona,
     481 U.S. 137 (1987).  The Court has also held that when a jury is presented with both

27   premeditation and felony-murder theories to support a first degree murder verdict, the constitution
     does not require unanimity as to which of these theories supports the verdict.  Schad v. Arizona,

28   501 U.S. 624 (1991).  The principles underlying those decisions have no application here.

1    No U.S. Supreme Court decision has articulated a constitutional prohibition or limitation that

2    applies to the imposition of first-degree murder liability on a felony-murder theory.  California's

3    felony-murder framework has long survived constitutional scrutiny.  See Suniga v. Bunnell, 998

4    F.2d 664 (9th Cir. 1993); McMillan v. Gomez, 19 F.3d 465, 470 (9th Cir. 1994); Cavitt v. Cullen,

5    728 F.3d 1000 (9th Cir. 2014).  "The felony murder rule is too deeply rooted in Anglo-American

6    jurisprudence to be questioned now."  McMillan, 19 F.3d at 470.

7        Because California law provides for a first-degree murder verdict on felony-murder

8    grounds, proof of petitioner's intent to kill Elliot was not required.  It was entirely reasonable for

9    the state courts to deny this claim without comment.

10       VI.    Claim Six:  Denial of a Fair Trial

11           A.  Petitioner's Allegations

12       Petitioner alleges that he was denied a fair trial by the court's "abuse of discretion on

13   several constitutional issues."  ECF No. 38 at 68.  He claims more specifically that his rights were

14   violated by the following actions of the trial court: (1) failure to inform the jury sua sponte that

15   Kobra Turner and James Willis were accomplices as a matter of law, and that their testimony

16   therefore could not be accepted without corroboration; (2) failure to inform the jury that

17   Christopher Culberson was an accomplice and facing multiple charges; (3) failure to inform the

18   jury that Christopher Culberson had not been charged in the referenced cases; (4) failure to

19   suppress the preliminary hearing testimony of Christopher Culberson; (5) failure to admonish the

20   prosecutor for impugning the honesty of defense counsel; (6) failure to respond to improper

21   prosecutorial argument with jury admonitions or declaration of mistrial; (7) failing to require

22   proof of intent to kill; (8) permitting the first degree murder verdict to stand even though the jury

23   had deadlocked on the robbery-murder special circumstance.  Id. at 68-70.

24           B.  The Clearly Established Federal Law

25       Any claim that the state court misapplied state law is not cognizable in a federal habeas

26   action.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[W]e have repeatedly held that 'it is not

27   the province of a federal habeas court to reexamine state-court determinations on state-law

28   questions.'"); Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (federal habeas corpus relief does not lie

19

1   for errors of state law). This court is bound by the state court's interpretation of California state

2   law. Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's

3   interpretation of state law, including one announced on direct appeal of the challenged conviction,

4   binds a federal court sitting in habeas corpus."). "[A] mere error of state law . . . is not a denial of

5   due process." Rivera v. Illinois, 556 U.S. 148, 158 (2009) (quoting Engle v. Isaac, 456 U.S. 107,

6   121, n. 21 (1982)).

7       No U.S. Supreme Court precedent requires proof of intent to kill in a felony-murder case,

8   requires corroboration of accomplice testimony, or categorically prohibits inconsistent verdicts.

9           C.  The State Court's Ruling

10      The superior court' decision addressed some of these matters, as follows:

11          Petitioner also claims that the trial court erred in not instructing the
12          jury sua sponte that Turner and Willis were accomplices as a matter
            of law and that the jury should be given proper accomplice
13          testimony instruction.

14          Petitioner, however, fails to attach any copy of trial transcript
            evidencing that Turner and Willis were accomplices as a matter of
15          law.  From the Third District Court of Appeal's description of the
            evidence shown at trial, in its opinion affirming the judgment on
16          appeal, it does not appear that either was shown to be an
            accomplice as a matter of law or that the trial court had erred in
17          giving the jury the question.  As petitioner fails to show otherwise,
            the claim is denied (Harris, supra; Bower, supra).

18   ECF No. 38-1 at 66.

19          Petitioner next claims that the trial court erred in allowing the first
            degree murder verdict to stand even though the jury had deadlocked
20          on the robbery-murder special circumstance, and that appellate
            counsel was ineffective in failing to raise the claim on appeal.
21

22          Juries, however, may render inconsistent verdicts, even when the
            jury has found a defendant guilty of murder based solely on a
23          felony-murder theory but acquitted the defendant on the related
            felony-murder special circumstance (Penal Code § 954; People v.
24          York (1992) 11 Cal.App.4th 1506).  "Inconsistent findings by the
            jury frequently result from leniency, mercy or confusion.  [citation
25          omitted.]  Such inconsistencies in no way invalidate the jury's
            findings" (York, supra, 11 Cal.App.4th 1506, 1510).  Thus, in this
26          case, that the jury deadlocked on the robbery-murder special
            circumstance did not affect the validity of the verdict of first degree
27          murder based on a robbery-murder theory.

28   ECF No. 38-1 at 67-68.

20

1    There is no other reasoned state court decision on matters presented in Claim Six.

2        D.  Objective Reasonableness Under § 2254(d)

3        In this claim, petitioner expressly challenges the trial court's exercise of discretion.  The

4    Ninth Circuit Court of Appeal has emphasized that "it is not our role on federal habeas review to

5    pass upon the wisdom of a state court's discretionary decisions.  It is of no moment that we may

6    disagree with the court's reasons or that we may have made different choices ourselves; 'our *only*

7    *concern* when reviewing the constitutionality of a state-court conviction is whether the petitioner

8    is in custody in violation of the Constitution or laws or treaties of the United States.'"  Gonzalez

9    v. Knowles, 515 F.3d 1006 (9th Cir. 2008) (emphasis in original and internal quotations omitted)

10   (quoting Schell v. Witek, 218 F.3d 1017, 1025 (9th Cir. 2000)).  This court has no authority to

11   grant habeas relief absent any constitutional violation.  See 28 U.S.C. § 2254(a).  Petitioner's

12   disagreement with the trial court's decisions does not render them unconstitutional.

13       The allegations fall far short of establishing a due process or Sixth Amendment violation.

14   The question whether witnesses should be treated as accomplices for purposes of requiring

15   corroboration is a purely state law issue.  Petitioner makes no showing that Christopher

16   Culberson, who was neither a witness nor a defendant in this case, has any relevance at all, let

17   alone significance of constitutional dimension.[6]  The allegations regarding improper prosecutorial

18   argument and absence of proof of intent have already been addressed and found insufficient to

19   state a constitutional claim.  Finally, petitioner's challenge to the inconsistent verdict lacks a basis

20   in clearly established federal law.  For all these reasons, the state courts' rejection of these claims

21   was not objectively unreasonable.

22   VII.   Claim Seven:  Jury Misconduct

23       A.  Petitioner's Allegations

24       Petitioner alleges that his Sixth Amendment rights were violated when three of the jurors

25   formed an opinion of guilt outside the courtroom before hearing all the evidence and prior to jury

26

---

27   [6] The reference to Culberson's "preliminary hearing transcripts" as "inconsistent with the. . .
     evidence on how Mr. Flores was killed," ECF No. 38 at 69, only deepens the mystery.  There is

28   no decedent named Flores in this case.

1   deliberations.  ECF No. 38 at 72-75.  Petitioner references the transcript of a hearing that was

2   held in the trial court regarding the juror misconduct allegations, ECF No. 38-1 at 5-62

3   (Petitioner's Ex. B).  The transcript reflects the following facts:

4          On the morning of March 26, 2008,[7] superior court research attorney Paul Dorris was in a

5   local café when he overheard three jurors from petitioner's trial discussing the case.  Mr. Dorris

6   testified that the three jurors were discussing trial witnesses and evidence, as well as the

7   performance of the attorneys.  Evidentiary issues that were mentioned included the loss of a

8   receipt[8], a mother making a dubious identification, the qualifications of expert witnesses, and

9   something found in the trunk of a car.  One juror said "that if they're down here, they're all

10  guilty."  ECF No. 38-1 at 9 (RT 1557).  Another juror then interjected that what was meant was

11  that this could be said to get out of jury duty in the future – something the three jurors then agreed

12  would not be appropriate.  One juror talked about her husband experiencing the theft of marijuana

13  plants he was growing.  At some point someone commented, "put a fork in them they're done."

14  Mr. Dorris did not know what this referred to.  Id. at 10 (RT 1558), 12 (RT 1560).  Mr. Dorris

15  made contemporaneous notes of what he heard the jurors say.  He did not hear the jurors make

16  any statements expressing opinions about petitioner's guilt.  Id. at 13 (RT 1561).

17  Juror No. 9 confirmed under oath that he had engaged in the discussion reported by Mr. Dorris,

18  contrary to the judge's admonition.  He testified that the discussion had been about defendant

19  Doughton's matter, not petitioner's.  Id. at 19-20 (RT 1567-68).[9]  The reference to a lost receipt

20  had been made in passing, in the context of general banter about why jurors had discounted

21  certain witnesses.  Id. at 20, 23.  The discussion of experts was related to the lifting of

22  fingerprints, which had nothing to do with the evidence against petitioner.  Id. at 30-31 (RT 1578-

23  79).  The "put a fork in it" comment was a reference to the jury's own state of frustration, and not

24  ////

25  _____

26  [7] Jury deliberations commenced on March 19, 2008.  CT 674-75.  Accordingly, the alleged
    misconduct occurred after the evidence had concluded but outside the jury room.

27  [8] Petitioner's alibi witness had testified that she made notes related to the fender-bender on a
    receipt, which she had discarded.

28  [9] The jury had returned verdicts as to Doughton the day before.  See CT 697.

a comment about the defendant.  Id. at 25.[10]  Juror No. 9 testified that nothing about the conversation would affect his deliberations, that he felt no association or bond with Juror No. 12 and Juror No. 4 that would affect deliberations, and that nothing that had been discussed at the café would affect the integrity of deliberations going forward.  Id. at 27-29 (RT 1575-77).

Juror No. 12 testified that the conversation at the café was not about the case against petitioner, but was addressed to "the case that we had already decided."  Id. at 33 (RT 1581). Juror No. 12 did not recall discussion of a receipt.  Id. at 34 (RT 1582).  Juror No. 12 had jokingly reported that her nephew had told her he would have used the line "if they're here they must be guilty" to get out of jury service, which she and her fellow jurors agreed was inappropriate.  Id. at 39-40 (RT 1587-88).  She did not recall the "put a fork in them" comment.  Id. at 37 (RT 1585). Juror No. 12 assured the court and counsel that the conversation would have no effect on ongoing deliberations regarding petitioner.  Id. at 35-37 (RT 1583-85).

Juror No. 4 reported that she and the other two jurors had been discussing the part of the case "that had already been completed and was already done," specifically the verdicts regarding Mr. Doughton.  Id. at 43-44 (RT 1591-92).  She acknowledged that discussion of a receipt would relate to Destiny Scott's testimony for petitioner, but she did not recall this being discussed at the café.  Id. at 44 (RT 1592).  She vaguely remembered the "put a fork in them" comment and was not sure what it was about, but was sure it was not a reference to "a person in this trial."  Id. at 46 (RT 1594).  Juror No. 4 had told the other two jurors about her ex-husband's marijuana having been stolen years ago, and that she had been upset that he was growing marijuana.  Her ex-husband's experience had no effect on her deliberations.  Id. at 46-47 (RT 1594-95).[11]  Juror No. 4 denied that any comments that had been made reflected bias or an opinion as to petitioner's

[10] "Like at the end of the day, work sometimes, you know people say put a fork in me, I'm done." Id. at 26 (RT 1574).  "[Our frustration was] not that we had to return [for another day of deliberations], it came about that feeling that we – I was ready to go back to work today.  And this is a very tough and emotional case.  It's, you know, so important, that yesterday we kind of like, we thought we were done.  It was just kind of like – we sat there for a few hours without a break, not knowing what was going on until the end of the day."  Id. at 30 (RT 1578).

[11] The marijuana plants had been stolen from the backyard while Juror No. 4 and her husband had been at work; there was no robbery.  Juror No. 4 had not brought up this incident during jury selection because it was long ago and she had forgotten all about it.  Id. at 52-53 (RT 1600-01).

1 guilt, and assured the court and counsel that the conversation would have no effect on ongoing

2 deliberations regarding petitioner.  Id. at 49-51 (RT 1597-99).

3       On the basis of this testimony, petitioner's counsel moved for a mistrial "[o]ut of an

4 abundance of caution and to protect the record."  Id. at 54 (RT 1602).  The trial court denied the

5 motion, finding that the jurors had violated the court's rule prohibiting discussion unless all jurors

6 are present in the jury room, but that no party had been prejudiced.  Id. at 59-60 (RT 1607-08).

7 Specifically, the court found that none of the three jurors were biased, that no bond or allegiance

8 had been formed among them, and that all were able to continue to deliberate fairly.  Id.  The

9 court gave the entire jury a supplemental admonition about the importance of discussing the case

10 only during formal deliberations.  Id. at 61 (RT 1609).

11       B.  The Clearly Established Federal Law

12       The constitution guarantees trial by impartial jurors who decide the case exclusively on

13 the basis of the evidence presented in the courtroom.  See Smith v. Phillips, 455 U.S. 209, 217

14 (1982); Turner v. Louisiana, 379 U.S. 466, 472-73 (1965).  A single juror's improperly

15 influenced vote deprives a defendant of an unprejudiced, unanimous jury.  See Parker v. Gladden,

16 385 U.S. 363, 366 (1966).  Contact between a juror and a witness or interested party is

17 presumptively prejudicial, although this presumption can be overcome.  Mattox v. United States,

18 146 U.S. 140, 142 (1892).  No U.S. Supreme Court case holds, however, that discussion among

19 jurors outside the deliberation room, without more, violates the constitutional rights of a

20 defendant.

21       C.  The State Court's Ruling

22       The superior court's written decision did not address this claim, and the California

23 Supreme Court denied it summarily.  Accordingly, this court asks whether there is any reasonable

24 basis for the state court's decision denying relief.  Richter, 131 S. Ct. at 786.

25       D.  Objective Reasonableness Under § 2254(d)

26       The trial court made factual findings that none of the offending jurors had reached a

27 conclusion about guilt outside the jury room and that none of them were biased against petitioner

28 or unable to continue deliberating.  These findings were not unreasonable in light of the evidence

24

1  presented at the hearing, and it was not unreasonable of the state habeas courts to leave them

2  undisturbed on collateral review.  See § 2254(d)(2).

3        Nothing in the record indicates that any of the jurors were biased against petitioner or that

4  their conversation communicated or constituted prejudicial extrinsic material.  All three jurors

5  testified that their conversation had been about the concluded deliberations regarding petitioner's

6  co-defendant.  The only fact that suggests otherwise is the reference to the lost receipt, which

7  relates to petitioner's alibi witness.  However, nothing suggests that this was more than a passing

8  reference.  There are no facts or circumstances supporting an inference that mention of the receipt

9  reflected bias on the part of the speaker or had a prejudicial effect on the jurors who heard the

10  comment.  The "put a fork in them" comment, while suggestive at first blush of a conclusion

11  regarding guilt, was plausibly explained as a comment about the jurors' own exhaustion at the

12  end of a long day.  The comment that "if they're here they must be guilty" was also subject to an

13  innocent explanation.  The trial judge, who was able to observe the demeanor of the jurors at the

14  hearing, accepted these explanations as truthful.  There was no reason for the state habeas courts

15  to revisit that credibility determination, and still less reason for this court to do so.  Indeed, failure

16  to defer to the state court's credibility determination would be contrary to the AEDPA.

17        Petitioner's vociferous assertion of "actual bias" is factually unsupported.  Because the

18  facts do not support a prima facie case of a constitutional violation, the state court's summary

19  denial of relief was not unreasonable.  See Cullen v. Pinholster, 131 S. Ct. 1388, 1402 n.12

20  (2011) (California summary denial represents determination that petitioner failed to state a prima

21  facie case); Nunes v. Mueller, 350 F.3d 1045, 1054-55 (9th Cir. 2003) (where state court issues

22  summary denial, the absence of a prima facie case is the determination that must be reviewed for

23  reasonableness under § 2254(d)).

24  VIII.   Claim Eight:  Coercive "Firecracker" Instruction

25        A.  Petitioner's Allegations

26        Jury deliberation began on March 19, 2008.  CT 674.[12]  On March 25, 2008, the jury

27

28  _____
    [12] "CT" refers to the Clerk's Transcript on Appeal.

convicted Doughton on all counts and found all of the enhancement allegations against him to be true.  CT 697-700.  However, the jury indicated that it was split on the charges against Scott.  CT 700.  A note from the jury stated, "We as a jury could not reach a unanimous decision as to Kobra Turner being an accomp[l]ice or not.  And we did not recieve [sic] any collaborating [sic] evidence, that was sufficient.  The count was 11 to believe she was not an accomplice and 1 believed she was an accomplice."  CT 697.

The trial court inquired whether jurors thought further instruction on the accomplice issued would help them reach a decision.  Eleven jurors stated that further instruction might help, and one juror expressed doubt that it would.  The court also asked jurors whether further argument would be helpful on the issue.  One juror thought further argument would be helpful, seven thought it might be, and four did not.  The court announced it would allow counsel to present additional argument on the accomplice issue and sent the jury home for the night.  RT 1514-18.[13]

The next morning, all counsel briefly argued the issue of whether the evidence showed Turner to be an accomplice.  At the conclusion of the arguments, the court reread CALCRIM Nos. 334, 703, and 707 to the jury.  The court then instructed the jury as follows:

> It has been my experience on more than one occasion that a jury which initially reported it was unable to reach a verdict, was ultimately able to arrive at verdicts on one or more of the counts before it.
>
> To assist you in your further deliberation, I'm going to give you a further instruction as follows: Your goal as jurors should be to reach a fair and impartial verdict, if you are able to do so, based solely on the evidence presented, and without regard for the consequences of your verdict, regardless of how long it takes to do so.
>
> It is your duty as jurors to carefully consider, weigh and evaluate all of the evidence presented at the trial, to discuss your views regarding the evidence, and to listen and consider the views of your fellow jurors.
>
> In the course of your further deliberations, you should not hesitate to re-examine your own views or to request your fellow jurors to re-examine theirs.

---

[13] "RT" refers to the Reporter's Transcript on Appeal.

You should not hesitate to change a view you once held, if you are convinced it is wrong, or to suggest other jurors change their views if you are convinced they are wrong.

Fair and effective jury deliberations require a frank and forthright exchange of views.  As I previously instructed you, each of you must decide this case for yourself, and you should do so only after a full and complete consideration of all of the evidence with your fellow jurors.

It is your duty as jurors to deliberate with the goal of arriving at a verdict on the charge, if you can do so without violence to your individual judgment.

Both the People and the defendant are entitled to the individual judgment of each juror.

As I previously instructed you, you have the absolute discretion to conduct your deliberations in any way you deem appropriate.

May I suggest that since you have not been able to arrive at a verdict using the methods that you have chosen, that you consider to change the methods you have been following, at least temporarily, and try new methods.  For example, you may wish to consider having different jurors lead the discussions for a period of time or you may wish to experiment with reverse role playing, by having those on one side of the issue present and argue the other side's position and vice versa.  This might enable you to better understand the other's positions.

By suggesting you should reconsider changes in your methods of deliberations, I want to stress that I am not dictating or instructing you as to how to conduct your deliberations.  I merely find that you may find it productive to do whatever is necessary to ensure each juror has a full and fair opportunity to express his or her views and consider and understand the views of the other jurors.

I also suggest you reread instructions 200 and 3250 [sic; 3550].  These instructions pertain to your duties as jurors and make recommendations as to how you should deliberate.

The integrity of a trial court requires that jurors at all times during deliberations conduct themselves as required by these instructions.

Instructions 200 and 3250 [sic; 3550] define the duties of a juror.[14]

The decision the jury renders, must be based on the facts and the law.  You must determine what facts have been proved from the evidence received in this trial and not from any other source.

---

[14] CALCRIM No. 200 defines the respective roles of the judge and jury along with a cautionary statement that not all instructions necessarily apply to the case.  CALCRIM No. 3550 instructs jurors on how to approach their tasks during deliberation.

A fact is something proved by the evidence or by a stipulation. Second, you must apply the law that I state to you to the facts as you determine them, and in this way, arrive at your verdict.

You must accept and follow the law as I state it to you, regardless of whether you agree with the law.

If anything concerning the law said by the attorneys in their arguments or at any other time during the trial, conflicts with my instructions on the law, you must follow my instructions.

Instruction 32 – strike that – 3550 defines the jury's duty to deliberate. The decisions you make in this case must be based on the evidence received in this trial, and the instructions given to you by the Court.

These are the matters this instruction requires you to discuss for the purpose of reaching a verdict. Instruction 3550 also recommends how jurors should approach their task. You should keep in mind the recommendation this instruction suggests when considering the additional instructions, comments, and suggestions I have made in the instructions now presented to you.

I hope my comments and suggestions may have been of some assistance to you.

You are ordered to continue your deliberations at this time. If you have any other questions, comments, requests, or any communications you desire to report to me, please put those in writing on the form the bailiff has provided to you.

Now, I'm gonna order you to return to the jury room for further deliberations.

RT 1550-53.

The jury resumed deliberations. The next day, the jury indicated it "was still split." The jury requested clarification of terms, including the word "slight." The trial court responded by defining the terms. Later that day, the jury requested further elaboration on the meaning of "slight." The court responded, "That is the definition." CT 719-22.

The next day, March 28, 2008, the jury returned a verdict convicting petitioner of the murder and robbery of Elliott and finding true the allegation of robbery in concert. However, the jury remained split on the charged robbery of MacKelvie and one of the enhancement allegations. CT 727-28. The court declared a mistrial as to the second robbery charge and gun enhancement allegations. The prosecution dismissed the mistried matters in the interest of justice. CT 728-29.

Petitioner contends that the "firecracker" instruction coerced the verdicts against him. See

28

1   ECF No. 38 at 75-91.

2        B.  The Clearly Established Federal Law

3        The constitutional guarantee of due process protects criminal defendants from coerced

4   jury verdicts.  Lowenfield v. Phelps, 484 U.S. 231, 241 (1988).  Instructions which encourage

5   dissenting jurors to give weight to the views of the majority do not have such inherently coercive

6   effect that they necessarily violate the due process right to a fair and impartial jury.  Id. at 237.

7   Rather, the existence of coercion must be determined on a case by case basis.  Id.  In assessing

8   coercive effect, it is clearly established that the reviewing court must consider the challenged

9   instruction "in its context and under all the circumstances."  Jenkins v. United States, 380 U.S.

10  445, 446 (1965) (per curiam).

11       C.  The State Court's Ruling

12       This claim was raised on direct appeal.  The California Court of Appeal decision, Lodged

13  Doc. No. 3, constitutes the last reasoned decision on the merits because the state supreme court

14  denied discretionary review.  See Ylst v. Nunnemaker, 501 U.S. 797 (1991); Ortiz v. Yates, 704

15  F.3d 1026, 1034 (9th Cir. 2012).  The appellate court ruled as follows:

16         The supplemental instruction challenged in this case is substantially
       identical to that reviewed in [People v.] Moore, 96 Cal.App.4th
17         1105 [(2002)] at pages 1118 to 1121.  In Moore, we concluded that
       the instruction did not exert a coercive effect on jurors.  (Id. at p.
18         1121.)  Instead, the instruction "directed the jurors to consider
       carefully, weigh and evaluate all of the evidence presented at trial,
19         to discuss their views, and to consider the views of their fellow
       jurors."  (Ibid.)  In People v. Whaley (2007) 152 Cal.App.4th 968
20         (Whaley), at pages 982-983, the same instruction was again upheld
       against similar challenge that it coerced a holdout juror into
21         capitulating to the verdict.

22         Scott contends Moore and Whaley were wrongly decided but offers
       no authority casting doubt on the propriety of the instruction.
23         Instead, Scott suggests the "particular circumstances" of this case
       rendered the supplemental instruction wrongful.  Specifically, Scott
24         asserts that the trial court's rereading of accomplice instructions in
       addition to additional arguments by counsel "amounted to a de
25         facto dynamite charge designed to have the holdout juror reexamine
       his or her position and embrace unanimity."
26

27         Scott mischaracterizes the trial court's handling of the split jury as
       an "onslaught" on the single juror who disagreed with the other 11.
28         The trial court properly reread the pattern jury instructions
       regarding accomplices to crimes after 11 jurors expressed the

1    opinion that further instruction would be helpful.  Although one
     juror expressed doubt regarding the helpfulness of further
2    instruction, even this juror did not deny the possibility that further
     instruction would ultimately assist the jury.  Thus, the court did not
3    err in rereading instructions regarding the accomplice issue.  A trial
     court has a responsibility to help the jury understand the law
4    governing a case.  (People v. Beardslee (1991) 53 Cal.3d 68, 97.)

5    The trial court also did not err in allowing all counsel to briefly
     argue the accomplice issue after a majority of jurors indicated that
6    further argument might be helpful.  As the California Supreme
     Court has noted, "a court must do more than figuratively throw up
7    its hands and tell the jury it cannot help.  It must at least consider
     how it can best aid the jury."  (People v. Beardslee, supra, 53
8    Cal.3d at p. 97.)

9    Here, the trial court responded appropriately to the jury's professed
     difficulty in reaching a verdict as to the charges and allegations
10   against Scott.  The court sought to shed light on the accomplice
     issue by rereading the applicable jury instructions and allowing all
11   counsel to present further argument on the issue.  To facilitate the
     productive deliberations, the court gave the supplemental
12   instruction approved in Moore and Whaley.  Although Scott decries
     the court's efforts as an onslaught, the record instead shows the
13   court did not overreach in its efforts to help the jury resolve the
     accomplice issue.
14
     The trial court did not err in giving the supplemental instruction
15   informing the jury of productive strategies for further deliberation.

16       D.  Objective Reasonableness Under § 2254(d)

17       When an "Allen charge"[15] is challenged in post-conviction proceedings, factors relevant

18   to the necessary coercion analysis include (1) the form of the instruction, (2) the amount of time

19   of deliberation following the charge, (3) the total time of deliberation, and (4) other indicia of

20   coerciveness.  Weaver v. Thompson, 197 F.3d 359, 366 (9th Cir. 1999).  The California Court of

21   Appeal properly evaluated the challenged instruction in its context and under all the relevant

22   circumstances, and reasonably concluded that the effect was not coercive.

23       First, the form of the instruction was innocuous.  Pursuant to state law, the court (1)

24   informed the jurors that they had "the absolute discretion to conduct your deliberations in any

25   way you deem appropriate;" (2) emphasized that it is the jury's duty to weigh the evidence; (3)

26   informed the jurors that their "goal as jurors should be to reach a fair and impartial verdict if you

27   are able to do so based solely on the evidence" and "without doing violence to your individual

28   _____
     [15] Allen v. United States, 164 U.S. 492 (1896).

                                        30

judgment;" (4) phrased the comments by the judge as suggestions; and (5) stressed that the trial judge was not "dictating or instructing you as to how to conduct your deliberations."  See People v. Moore, 96 Cal.App.4th 1105, 1119 (2002).  Nothing in this language could reasonably be interpreted as pressure to surrender a conscientious doubt as to guilt.  The court made it clear to the jury that all matters of fact were for its determination, which is the "essential question" in assessing coerciveness.  Navellier v. Sletten, 262 F.3d 923, 943 (9th Cir. 2001).

As to the second and third factors, the instruction was given on the fifth day of deliberations (and one day after verdicts had been returned as to petitioner's co-defendant), and a verdict was returned as to petitioner two days after the instruction was given.  Both before and after the "firecracker" instruction, the jury made frequent requests for evidence and for clarification on multiple issues.  This record of deliberations is consistent with a jury that was conscientiously working as a body.  See United States v. Berger, 473 F.3d 1080, 1093 (9th Cir. 2007) (fact that jury was deliberating means that "the judge did not make his remarks in an atmosphere where the jurors would have felt that unanimity was their only escape from the jury room.").  Moreover, the Ninth Circuit has repeatedly found no coercion where the length of deliberations between instruction and verdict was significantly less than that in this case.  See e.g., United States v. Bonam, 772 F.2d 1449, 1450-51 (9th Cir. 1985) (per curiam) (one-and-a-half hours); United States v. Beattie, 613 F.2d 762 (9th Cir.) (three-and-a-half hours), cert. denied, 446 U.S. 982 (1980); United States v. Lorenzo, 43 F.3d 1303 1307 & n.3 (9th Cir. 1995) (five-and-a-half hours); compare Weaver, 197 F.3d at 366 (coercion found when jury returned with unanimous verdict five minutes after receiving Allen charge).

As to the fourth factor, petitioner points to the circumstance that counsel were permitted to reargue the issue whether Kobra Turner should be considered an accomplice whose testimony required corroboration.  The California Court of Appeal ruled that the supplemental arguments were a permissible way to assist the jury, and did not create a context in which the "firecracker" instruction had coercive effect.  This conclusion is not objectively unreasonable.

Overall, the state court's assessment of coercive effect was not unreasonable and therefore may not be disturbed by this court.  The Supreme Court and Ninth Circuit have held that AEDPA

31

1  bars relief in situations that present a far stronger showing of coercion than is presented here.  See

2  Early v. Packer, 537 U.S. 3 (2002) (AEDPA precludes relief where holdout juror twice sought to

3  be relieved and trial court required her to continue deliberating); Deweaver v. Runnels, 556 F.3d

4  995 (9th Cir. 2009), cert. denied, 130 S. Ct. 183 (2009) (AEDPA precludes relief where the trial

5  court had singled out a holdout juror, inquired into the deliberative process, and given a 45-

6  minute hypothetical that illustrated the permissible inference of guilt from circumstantial

7  evidence).  Accordingly, petitioner is not entitled to relief on this claim.

8       IX.    Claim Nine:  Erroneous "Flight" Instruction

9         A.  Petitioner's Allegations

10       During the jury instruction conference, the prosecution requested a flight instruction on

11  grounds that it was required by Cal. Penal Code § 1127c.[16]

12       Over objection by both petitioner and co-defendant Doughton, the trial court gave

13  CALCRIM No. 372 as follows:

14  
15           If the defendant fled or tried to flee immediately after the crime was
         committed or after he was accused of committing the crime, that
         conduct may show that he was aware of his guilt.  If you conclude
16           that the defendant fled or tried to flee, it is up to you to decide the
         meaning and importance of that conduct.  However, evidence that
         the defendant fled or tried to flee cannot prove guilt by itself.
17  

18  RT 1314.

19       Petitioner contends that the instruction was given in error because there was no substantial

20  evidence that he fled immediately after the commission of the crime.  Petitioner contends further

21  that the erroneous instruction prejudiced him.  ECF No. 38 at 91-97.

22         B.  The Clearly Established Federal Law

23       A claim that the state court misapplied state law is not cognizable in a federal habeas

24  action.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  Erroneous jury instructions do not

---

25  [16] Section 1127c provides: "In any criminal trial or proceeding where evidence of flight of a
26  defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as
follows: [¶]  The flight of a person immediately after the commission of a crime, or after he is
accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a
27  fact which, if proved, the jury may consider in deciding his guilt or innocence.  The weight to
which such circumstance is entitled is a matter for the jury to determine.  [¶]  No further
28  instruction on the subject of flight need be given."

1  support federal habeas relief unless the infirm instruction so infected the entire trial that the

2  resulting conviction violates due process.  Id. at 72 (citing Cupp v. Naughten, 414 U.S. 141, 147

3  (1973)).  See also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be

4  established not merely that the instruction is undesirable, erroneous, or even 'universally

5  condemned,' but that it violated some [constitutional right]'").  The challenged instruction may

6  not be judged in artificial isolation, but must be considered in the context of the instructions as a

7  whole and the trial record overall.  Estelle, 502 U.S. at 72.  Moreover, relief is only available if

8  there is a reasonable likelihood that the jury has applied the challenged instruction in a way that

9  violates the Constitution.  Id. at 72–73.

10          C.  The State Court's Ruling

11          This claim was raised on direct appeal.  The California Court of Appeal decision, Lodged

12  Doc. No. 3, constitutes the last reasoned decision on the merits because the state supreme court

13  denied discretionary review.  See Ylst v. Nunnemaker, 501 U.S. 797 (1991); Ortiz v. Yates, 704

14  F.3d 1026, 1034 (9th Cir. 2012).  The appellate court ruled as follows:

15
16          The California Supreme Court has "construed section 1127c 'as
            mandating a rule that if there is evidence identifying the person who
            fled as the defendant, and if such evidence is relied on as tending to
17          show guilt, then a flight instruction is proper.' (People v. Roberts
            (1992) 2 Cal.4th 271, 310.)   'A flight instruction is proper
18          whenever evidence of the circumstances of [a] defendant's
            departure from the crime scene . . . logically permits an inference
            that his movement was motivated by guilty knowledge.' (People v.
19          Turner [(1990)] 50 Cal.3d [669,] 694.)"  (People v. Abilez (2007)
            41 Cal.4th 472, 521-522.)
20
21          Scott asserts the trial court erred in giving CALCRIM No. 372
            because "there was no evidence [he] fled after the commission of a
22          crime or after he was accused of a crime . . . ."  We disagree.

23          The record reveals sufficient evidence of flight by Scott to warrant
            the giving of CALCRIM No. 372.  Willis saw all four assailants,
24          including Scott, leave the garage and run toward the park.  Turner
            testified that the four men came running toward their parked cars.
25          Running away from the scene of a crime is the archetypal form of
            flight.  (See People v. Abilez, supra, 41 Cal.4th at p. 522.)

26          Scott protests that a hasty departure by itself does not establish
            guilt.  True.  However, the trial court must give a flight instruction
27          whenever the evidence is reasonably susceptible of a conclusion
            that defendant's departure indicated a consciousness of guilt.  "To
28          obtain the instruction, the prosecution need not prove the defendant

33

1

in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence."  (People v. Bonilla (2007) 41 Cal.4th 313, 328.)

2

3

After the murder, Scott traveled to Arizona when he did not have permission to leave California.  The jury could have found this to be a second instance of flight by Scott.  (People v. Carter (2005) 36 Cal.4th 1114, 1182 [flight instruction properly given when evidence showed defendant left California for Las Vegas after the crimes].)

4

5

6

Scott argues that the stipulation regarding his travel to Arizona without permission and his subsequent arrest in that state do not establish that he fled.  He contends there was no evidence of when he traveled to Arizona or whether he was trying to be evasive in doing so.  Regardless of the specific date defendant left for Arizona, he did not have permission to travel outside of California.  The jury had a reasonable basis to conclude that defendant's unauthorized departure from California constituted flight.  "[T]he instruction neither requires knowledge on a defendant's part that criminal charges have been filed, nor a defined temporal period within which the flight must be commenced, nor resistance upon arrest."  (People v. Carter (2005) 36 Cal.4th 1114,1182.)

7

8

9

10

11

12

13

Accordingly, we conclude that substantial evidence indicating flight by Scott justified the trial court's giving of CALCRIM No. 372.

14

15

   D.  Objective Reasonableness Under § 2254(d)

16

   The applicability of Cal. Penal Code § 1127c does not present a federal constitutional

17

question cognizable in habeas.  The state appellate court ruled that the evidence of flight was

18

sufficient to require the instruction under California law, and that decision may not be second-

19

guessed here.

20

   Even if the flight instruction was given in error, there would be no due process violation

21

because there is no likelihood that it was applied to deny petitioner's constitutional rights.  The

22

jury was instructed that flight alone did not establish guilt.  The prosecutor did not place undue

23

emphasis on petitioner's flight.  The independent evidence of petitioner's participation in the

24

robbery was sufficient to support the verdict.  There is no reason to suspect that consideration of

25

petitioner's travel to Arizona substantially affected the verdict, or that any influence it might have

26

had impaired petitioner's constitutional rights.  Accordingly, the state court's rejection of the

27

claim did not constitute an unreasonable application of federal law.  Even if AEDPA deference

28

did not apply, on grounds that the state appellate court did not reach or adjudicate the federal due

34

1  process aspect of this claim, petitioner would not be entitled to relief.  Under the circumstances of

2  the case, the flight instruction did not so infect the entire trial as to render it fundamentally unfair.

3                                              CONCLUSION

4         For all the reasons explained above, the state courts' denial of petitioner's claims was not

5  objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  Even without reference to

6  AEDPA standards, petitioner has not established any violation of his constitutional rights.

7  Accordingly, IT IS RECOMMENDED that the petition for writ of habeas corpus be denied.

8         These findings and recommendations are submitted to the United States District Judge

9  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

10  after being served with these findings and recommendations, any party may file written

11  objections with the court and serve a copy on all parties.  Such a document should be captioned

12  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

13  shall be served and filed within fourteen days after service of the objections.  The parties are

14  advised that failure to file objections within the specified time may waive the right to appeal the

15  District Courts order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

16  DATED: March 28, 2014

17

18                                                          ALLISON CLAIRE
                                                            UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26

27

28

                                                35